IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **JENIA L. JONES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil No. 14-cv-257-SMY-CJP** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM and ORDER

**YANDLE, District Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Jenia L. Jones seeks judicial review of the final agency decision denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits in November, 2010, alleging disability beginning on December 25, 2009. (Tr. 18). After holding an evidentiary hearing, ALJ William L. Hafer denied the application for benefits in a decision dated September 25, 2012. (Tr. 18-31). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1.    The ALJ erred in determining plaintiff's RFC by failing to include all limitations supported by the evidence and by improperly weighing the medical opinions.

2.    The ALJ failed to properly evaluate plaintiff's credibility.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[1]   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.    42  U.S.C.  §423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   20 C.F.R. §§ 404.1520.   Under this procedure, it must

---

[1] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.   Most citations herein are to the DIB regulations out of convenience.

be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence,

shall be conclusive. . . ." 42 U.S.C. § 405(g).  Thus, this Court must determine not whether Ms. Jones was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  In reviewing for substantial evidence, the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Hafer followed the five-step analytical framework described above.  He found that plaintiff was insured for DIB through December 31, 2015.  He determined that, although Ms. Jones had worked for two months as an LPN after the alleged date of onset, this did not constitute substantial gainful activity.  He found that she had severe impairments of degenerative joint disease of the left knee, degenerative disc disease of the lumbar spine (L4-5 and L5-S1) with spondylosis, obesity, bipolar disorder, anxiety

disorder with a degree of panic, and a personality disorder.   He further determined that her impairments did not meet or equal a listed impairment.

The ALJ found that Ms. Jones' allegations about her impairments and limitations were not credible.   He determined that she had the residual functional capacity (RFC) to perform work at the light exertional level, with some physical and mental limitations. She was unable to do her past relevant work as an LPN.   Based on the testimony of a vocational expert, the ALJ found that plaintiff was not disabled because she was able to do jobs which exist in significant numbers in the local and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff.

### 1.    Agency Forms

Plaintiff was born in 1964, and was 45 years old on the alleged onset date of December 25, 2009.  (Tr. 159).   She completed two years of college.  (Tr. 165).  Ms. Jones worked as an LPN from 1994 to December, 2009.   She again worked as an LPN in July and August, 2010.   (Tr. 165).

Ms. Jones submitted a Function Report in June, 2011, stating that she did very little throughout the day.   She said she had low back pain and bilateral leg pain.   She had migraine headaches.   She could not bend, stoop, kneel or climb stairs.   Sitting, standing or walking for more than ten minutes increased her pain.   She spent the day

sitting in a chair with her legs raised or lying in bed.   She rarely left home.   She went to Eagles meetings about every three months, but left after thirty minutes.   She lived with her mother.   She did very little housework except for washing a few dishes and making sandwiches.   She was taking Cymbalta, Temazepam and Xanax.   These medications caused side effects of drowsiness and dizziness.   (Tr. 207-214).

### 2.      Evidentiary Hearing

Ms. Jones was represented by an attorney at the evidentiary hearing on September 7, 2012.   (Tr. 38).

Plaintiff testified that she worked for a month and a half to two months in 2010 as an LPN.   She was fired for being rude to a patient.   She was having a lot of problems with pain and discomfort, so she was not sure how long she would have continued working there had she not been fired.   (Tr. 42-43).

Plaintiff said she had about four panic attacks a month.   She took Xanax.   She had mood swings.   She had been hospitalized for suicidal ideation.   She still had thoughts of suicide.   She cried at least once a day.   At times she had too much energy, and at other times she had none.   Her sleep was disturbed.   (Tr. 44-49).   She had pain in her low back and across the middle of her back.   She took Oxycodone.   She could sit for maybe twenty minutes.   She had migraine headaches at least once a week.   She had pain in her legs from neuropathy.   She had not had an EMG or nerve condition testing to confirm neuropathy.   (Tr. 50-54).   The pain in her legs was a burning sensation.   It went all the way down her legs into her feet.   She had swelling in her legs,

and she had to elevate her feet.   (Tr. 57-58).

Ms. Jones said that she did not do much during the day.   She might do a little cleaning for ten to fifteen minutes, and then she had to rest.   Her mother did the cooking, laundry and dishes.   She no longer went to Eagles meetings because she could not stand being around the crowd.[2]   (Tr. 54-55).

She began seeing Dr. Casey, a psychiatrist, about eight months earlier.   After she was discharged from the hospital, she was referred to the Department of Human Services, and they recommended that she see Dr. Casey.   (Tr. 56).   Plaintiff testified that her medications made her fall asleep.   (Tr. 64-65).   Ms. Jones did not have any income or a medical card.   Her doctor wanted to do tests, but could not because of the cost.   (Tr. 66-67).

A vocational expert (VE) also testified.   The ALJ asked her to assume a person of plaintiff's age and work experience who could do work at the light exertional level, limited to occasional stooping, kneeling, crouching, crawling and climbing stairs, no climbing of ladders, ropes or scaffolds, and no work at unprotected heights or around dangerous machinery.   She was also limited to work at a slow to moderate pace with no contact with the public and no close coordination or teamwork.   The VE testified that this person could not do plaintiff's past work, but would be able to do jobs which exist in the local economy, such as inspector in the food processing industry, garment sorter and inspector/packer.   (Tr. 67-70).

---

[2]  Plaintiff described the Eagles organization as a club.   Tr. 61.

3.     **Medical Treatment**

On December 25, 2009, Ms. Jones went to an emergency room in Breckenridge, Texas, after having fallen on ice.   She had pain in her left knee and right low back.   She was diagnosed with lumbar sprain/strain and a nondisplaced fracture of the left patella.   A knee immobilizer was applied and she was released on crutches.   She was told to follow up with her regular doctor.   (Tr. 239-255).

Plaintiff was seen in January and February, 2010, at Breckenridge Resource Care in Breckenridge, Texas, for left knee and back pain.   (Tr. 275-287).   She borrowed a TENS unit to control her low back pain, but it did not work.   (Tr. 282, 284).   On January 26, 2010, she had positive straight leg raising with radicular symptoms on the right.   (Tr. 282).   In February, 2010, it was noted that she wanted to wait on "full labs" as she was unemployed.   (Tr. 278-279).

On February 28, 2010, an MRI showed broad-based disc bulges at L4-5 and L5-S1, without canal stenosis or neural foraminal narrowing.   (Tr. 262).

Ms. Jones moved from Texas to Illinois.   She began seeing Dr. David Chung in August, 2010.   She complained of pain in her right foot, left knee and low back.   Dr. Chung noted that she was depressed and that she had a history of bipolar disorder.   He prescribed Celebrex for "lumbago" and Prozac for depression.   (Tr. 268-269).   In October, 2010, she reported that she had "problems" on Prozac, so her medication was changed to Cymbalta.   She was also prescribed Neurontin for neuropathy in both legs. (Tr. 266-267).

On February 7, 2011, Gregory C. Rudolph, Ph.D., performed a consultative psychological exam.   He concluded that plaintiff had Axis I diagnoses of major depressive disorder, generalized anxiety disorder with anxiety attacks and posttraumatic stress disorder.   He assigned a GAF score of 45-50.

On April 2, 2011, Vittal Chapa, M.D., performed a consultative physical exam. Ms. Jones complained of swelling in her legs and said her legs were sensitive to touch. She had headaches, panic attacks and depression.   She said she could not sit or stand for long.   Dr. Chapa noted that plaintiff was 5' 3" tall and weighed 205 pounds.   She had a normal gait.   Neurological exam was normal.   She had no motor weakness or muscle atrophy.   She was able to appreciate pinprick in the lower extremities.   She had no joint redness, heat, swelling or thickening.   She had a full range of motion of all joints. Lumbosacral spine flexion was normal.   There was no evidence of lumbar or cervical radiculopathy.   Muscle strength was full in upper and lower extremities.   (Tr. 306-309).

Dr. Chung saw plaintiff at regular intervals from May, 2011, to August, 2012. His notes regarding physical findings are minimal and consist mostly of check marks and circled entries on a form used to record office notes.   (Tr. 339-369).   In May, 2011, she reported that she was having panic attacks.   She reported headaches that lasted for hours.   She continued to have pain in her right ankle.   Dr. Chung added Xanax for anxiety and Percocet for chronic ankle pain, along with medication for migraine headaches.   (Tr. 344-345).

Plaintiff presented to Dr. Chung's office on June 26, 2011, with suicidal ideation.

She was tearful and depressed.   She had been off Cymbalta for several days.   Dr. Chung noted that she had "severe pain in legs chronically."   He advised her to go the emergency room.   (Tr. 346-347).   She was admitted to the hospital through the emergency room and was hospitalized from July 27, 2011, through August 1, 2011, for suicidal thoughts.   She said that she had exquisite pain from neuropathy in her legs, which caused her to want to kill herself.   She had recently had symptoms such as a lack of interest in activities, sadness, lack of energy, irritability and anxiety.   She also experienced manic symptoms such as feeling hyper and racing thoughts.   Her GAF on admission was 30.   She was treated with medication management and group and individual psychotherapy.   Neurontin was increased to 400 mg per day to address neuropathy.   A physical exam showed that she was "extremely tender to only light palpation" of her extremities.   At discharge, she was no longer suicidal.   Her GAF was 45.   She was to follow up with Dr. Chung.   (Tr. 320-327).

When Dr. Chung next saw her on August 8, 2011, her depression and anxiety were better and she denied suicidal thoughts.   (Tr. 348-349).   In March, 2012, she complained of episodes of pain in her low back.   Dr. Chung noted tenderness of the low back on exam.   He diagnosed lumbago.   (Tr. 358-359).   Back pain was again noted on June 11, 2012 (Tr. 363, "chronic LBP"), July 18, 2012 (Tr. 366), and August 21, 2012 (Tr. 368).   Dr. Chung's records also noted peripheral neuropathy on March 14, 2012 (Tr. 358), June 11, 2012 (Tr. 362), July 13, 2012 (Tr. 364), July 18, 2012 (Tr. 366), and August 21, 2012 (Tr. 368).

Dr. Chung's records noted that she "needs more assistance with meds" on June 11, 2012 (Tr. 363), and she was unable to afford some treatment on July 18, 2012 (Tr. 367).

Plaintiff also received psychiatric treatment from the Human Service Center. In January, 2012, it was noted that she had financial issues and had been unable to get some testing because she had no insurance. (Tr. 336-337). She was seen by Dr. Terrance Casey for medication monitoring. His diagnosis was Bipolar 1 disorder, mixed without psychosis. (Tr. 335). He adjusted and/or changed her medications on every visit, usually giving her samples. (Tr. 330-335). In June, 2012, Dr. Casey told plaintiff to "bring in information to Gail so she can get her on PAP [Patient Assistance Program] for seroquel." (Tr. 330).

4.    **Opinion of Treating Doctor**

Dr. Chung completed a report on August 21, 2012. (Tr. 339-343). He said his diagnoses included lumbago, chronic right ankle pain due to traumatic neuropathy, left knee pain secondary to patellar fracture and posttraumatic arthritis, depression and bipolar disorder. He indicated she could sit for 20 minutes, stand for 10 minutes, and lift only 3 pounds occasionally. She could never climb stairs or ladders, stoop or operate foot controls.

5.    **State Agency RFC Assessments**

On March 2, 2011, a state agency physician assessed plaintiff's mental RFC based on a review of the medical records. He concluded that she had sufficient cognitive and attentional abilities to perform simple, routine activities with only limited contact with

the general public.   (Tr. 302-304).

On April 11, 2011, a state agency physician assessed plaintiff's physical RFC based on a review of the medical records.   He concluded that she could do a full range of light work with no postural or other physical limitations.   (Tr. 310-317).

### Analysis

The Court first turns to plaintiff's challenge to the ALJ's credibility determination.

Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding."   *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.   The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3.   "[D]iscrepancies between objective evidence and self-reports may suggest symptom exaggeration."   *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

The ALJ is required to give "specific reasons" for his credibility findings.   *Villano*

*v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).   It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence.   *Ibid.*   See also, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir., 2009)(The ALJ "must justify the credibility finding with specific reasons supported by the record.")

As plaintiff points out, ALJ Hafer expressed his credibility findings in the boilerplate language that was criticized in cases such as *Bjornson v. Astrue*, 671 F.3d 640, 644-645 (7th Cir. 2012), and *Parker v. Astrue*, 597 F.3d 920, 921-922 (7th Cir. 2010). However, the use of the boilerplate language does not automatically require reversal.   It is harmless where the ALJ goes on to support his conclusion with reasons derived from the evidence.   See, *Shideler v. Astrue*, 688 F.3d 306, 310-311 (7th Cir. 2012); *Richison v. Astrue*, 462 Fed. Appx. 622, 625-626 (7th Cir. 2012).   ALJ Hafer failed to do so here.

Of particular relevance to this case, an ALJ may not conclude that a claimant is exaggerating her pain and limitations based on lack of medical treatment or failure to take medication without taking into account the claimant's inability to afford treatment. *Garcia v. Colvin*, 741 F.3d 758, 761-762 (7th Cir. 2013), citing SSR 96-7p, 1996 WL 374186, at *7-8.

ALJ Hafer relied heavily on his perception that plaintiff had not sought much medical treatment for his conclusion that her allegations were not credible.   He stated that "there is not much in the record for treatment" and called the diagnostic evidence "minimal."   (Tr. 26).   He rejected her claim of neuropathy in her legs because there was no EMG or nerve conduction study, and noted that Dr. Chung diagnosed diabetes

without glucose readings.   (Tr. 21).   He noted that Ms. Jones was not under the care of a psychiatrist for the whole of the period at issue.   (Tr. 26).   He described the medical evidence as "relatively weak."   (Tr. 27).   However, he never grappled with the fact that plaintiff had no income and no medical card, i.e., Medicaid coverage.

Plaintiff testified that she had no income and no medical card, and that she had not "been able to go get as much treatment and help as I need."   She testified that Dr. Chung "has a list of thing he wants to do, but cannot do them because I don't have any insurance."   This included a nerve conduction study and blood work.   (Tr. 66).   The medical records reflect that plaintiff had difficulty affording treatment and prescribed medications.   See, Tr. 330, 336-337, 363, 367.

Further, ALJ Hafer misstated the medical evidence.   In assessing the effect of her obesity, he stated that she did not suffer from diabetes.   However, blood work done on March 14, 2012, showed a high glucose level, and Dr. Chung diagnosed diabetes on June 11, 2012.   (Tr. 355, 363).   In assessing Dr. Chung's opinion, ALJ Hafer stated that "the only reference to back pain" occurred on the date that the doctor examined plaintiff for purposes of completing "disability paperwork."   (Tr. 27).   This is incorrect.   Dr. Chung's records noted back pain on several visits.   See, Tr. 268, 358, 363, 366, 368.

This case is remarkably similar to *Pierce v. Colvin*, 739 F.3d 1046, 1050-1051 (7th Cir. 2014), in which the credibility determination was held to be erroneous where the ALJ relied heavily on the absence of objective support for plaintiff's claim while ignoring her lack of health insurance and misstated some of the evidence.   See also, *Morgan v.*

*Astrue*, 393 Fed. Appx. 371, 375 (7th Cir. 2010), holding that a credibility determination based on "unsound reasoning" is erroneous.

In addition, the ALJ acknowledged that plaintiff described "limited daily activities," but did not consider this be "strong evidence" that she was disabled because her testimony could not be "objectively verified." (Tr. 27). The Seventh Circuit has rejected this reasoning. "Whatever uncertainty may exist around such self-reports is not by itself reason to discount them—otherwise, why ask in the first place?—and the relevant regulations specifically allow ALJs to consider claimants' 'daily activities.'" *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014). In addition, as in *Beardsley*, there was some verification in that her mother, with whom she lived, submitted a written report which confirmed her claim of limited daily activities. (Tr. 172-179). The ALJ rejected the mother's report because she is not medically trained and she was not "a disinterested party." This reasoning makes no sense. Any lay person who knows the plaintiff well enough to be able to comment on her daily activities is not likely to be "a disinterested party," so it is illogical for the agency to solicit the report of such a person and then discount it on that basis.

The erroneous credibility determination requires remand. "An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce,* 739 F.3d at 1051. Here, plaintiff's testimony is not incredible on its face, and it is clear that the decision depended in large part on plaintiff's credibility.

It is not necessary to address plaintiff's other point, but, as in *Pierce*, the determination of plaintiff's RFC will require "a fresh look" after reconsideration of Ms. Jones' credibility.   *Ibid.*   In particular, as noted above, the ALJ's weighing of Dr. Chung's opinion was based in part on a mistaken view of the medical evidence.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Jones is disabled or that she should be awarded benefits.   On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Jenia L. Jones' application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   March 18, 2015**

**s/ Staci M. Yandle**
**STACI M. YANDLE**
**DISTRICT JUDGE**

2